Jeffrey D. Eisenberg (#4029)
Jordan P. Kendell (#10950)
Christopher P. Higley (#15161)
**EISENBERG GILCHRIST & CUTT**
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 366-9100
Facsimile: (801) 350-0065
jeisenberg@egclegal.com
jkendell@egclegal.com
chigley@egclegal.com

John E. Hansen, (#4590)
SCALLEY READING BATES
HANSEN & RASMUSSEN, P.C.
15 W. South Temple, Suite 600
Salt Lake City, Utah 84101
Telephone: (801) 531-7870
hansen@scalleyreading.net

Adele P. Kimmel (*admitted pro hac vice*)
**Public Justice, P.C.**
1620 L. Street, NW Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
akimmel@publicjustice.net

*Attorneys for Plaintiff*

**BEFORE THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

| | |
|---|---|
| VICTORIA HEWLETT,<br><br>   Plaintiff,<br><br>v.<br><br>UTAH STATE UNIVERSITY, SIGMA CHI CORPORATION, GAMMA KAPPA ALUMNI FOUNDATION, GAMMA KAPPA, JASON RELOPEZ, GAMMA KAPPA HOUSE CORPORATION, and Jan and Jane Does I-XX<br><br>   Defendants. | **MOTION TO DISQUALIFY COUNSEL FOR GAMMA KAPPA**<br><br>Case No: 2:16-CV- 01141 DN<br><br>Judge David Nuffer |

Plaintiff Victoria Hewlett, by and through counsel and pursuant to Rules 7 of the Federal Rules of Civil Procedure and Local Rules DUCivR 7-1, submits this Motion to Disqualify Counsel for Gamma Kappa.

## TABLE OF CONTENTS

**PRECISE RELIEF REQUESTED** .................................................................................................. 2

**INTRODUCTION**................................................................................................................................ 3

**STATEMENT OF FACTS** ................................................................................................................ 7
   A.  Mr. Whitten Knew of M.K.'s rape in the fall of 2014. ............................................ 8
   B.  Mr. Knowlton's knowledge that Victoria was in the room on the night of the rape. ................................................................................................................................ 9
   C.  Mr. Weyand knew that Relopez had been told Relopez had been barred from Kappa Delta sorority events due to allegations of physical and emotional abuse of women. ...................................................................................................................... 10
   D.  Mr. Renner and Mr. Fairbanks' (and other GK members') knowledge of Relopez' inappropriate behavior. .................................................................................. 11

**ARGUMENT** ..................................................................................................................................... 12
   I.  A CONFLICT EXISTS UNDER RULE 1.7 BETWEEN GK'S LAWYERS AND OFFICERS THAT GK'S LAWYERS REPRESENT IN THIS MATTER. ............. 12
   II. DISQUALIFICATION IS REQUIRED TO AVOID EVEN MORE SERIOUS ETHICAL PROBLEMS AS THIS CASE PROCEEDS. ........................................... 15
     A.  GK's Lawyers have demonstrated disregard for Rule 1.7. ................................. 15
     B.  There is prejudice to GK, GK officers, and Plaintiff. ......................................... 17
     C.  GK's Lawyers' effectiveness has been diminished by the numerous conflicts. ................................................................................................................ 17
     D.  Hardship to GK's Officers favors disqualification. ............................................ 17
     E.  The stage of trial proceedings favors disqualification. ....................................... 18

**CONCLUSION** .................................................................................................................................. 18

## PRECISE RELIEF REQUESTED

Plaintiff asks this court to (1) recognize that non waivable conflicts of interests exist between and amongst Defendant Gamma Kappa ("GK") (USU's local Sigma Chi chapter) and its individual former members and Chapter Officers, and (2) enter an order disqualifying the law firms

of Saul Ewing Arnstein & Lehr LLP and Kipp & Christian[1] ("GK's Lawyers") from representing GK or individual chapter defendants in the present action. Such relief is appropriate and necessary because substantial, nonwaivable, concurrent conflicts of interest exist between the individual clients that GK's Lawyers represent, such conflicts also exist between the individuals and GK, and such conflicts also exist between the individuals and the Insurers and Sigma Chi defendants who have a longstanding attorney client relationship with GK's Lawyers.

## INTRODUCTION

Before filing this motion, Plaintiff's counsel consulted with three independent lawyers to evaluate the conflict issues. Each of the independent lawyers advised Plaintiff that serious conflicts exist which are not waivable. The Declaration of one of those consulted, Mr. Todd Wahlquist, is attached as <u>Exhibit A</u>. Mr. Wahlquist served as Deputy Senior Counsel for the Utah State Bar Office of Professional Conduct ("OPC") from 2011 to 2017 and in that role, he regularly handled matters relating to conflicts of interests and related ethical issues. Plaintiff has also met and conferred with GK's Lawyers several times prior to filing this motion.

GK's lawyers cannot continue the representation because it now has Current conflicts of interests because (1) "[t]he representation of one client will be directly adverse to another client" and "[t]here is a significant risk that the representation of one or more clients will be materially

---

[1] K&C is local counsel for Arnstein. It is unclear which of the individual officers K&C represents, directly or by virtue of the local counsel relationship. Plaintiff asked for clarification and received none. Plaintiff believes that K&C, by virtue of its relationship with Arnstein, represents the same individuals as Arnstein. In addition, Plaintiff has been informed by counsel for the Sigma Chi Defendants that they have been contacted by at least one individual in regards to representation in the State Court case. If that turns out to be the case, Plaintiff may need to seek leave to amend this Motion or file a similar motion addressing conflicts with counsel for Sigma Chi Defendants. In addition, Plaintiff asked counsel for all fraternity defendants to clarify whether valid waivers had been obtained. As of the filing of this brief, no satisfactory response has been received.

limited by the lawyer's responsibilities to another client." *See* Utah R. Prof. Cond. 1.7(a). In order to explain why the conflicts require that GK's Lawyers be disqualified, the background concerning how GK's Lawyers came to represent so many clients with conflicting positions is provided.

The individuals did not seek out and hire GK's Lawyers. Instead, GK's Lawyers sought the individuals out with offers to represent them to protect GK's position. GK's Lawyers have a longstanding relationship representing Sigma Chi, the Fraternity Insurers, and SC's Risk Management Company. In the summer of 2017, Plaintiff propounded interrogatories to GK seeking to obtain contact information for former GK members because Plaintiff desired to interview some of them off record. GK's Lawyers resisted this discovery. After hearing oral argument, the Court rejected GK's argument that all former GK members were insulated by GK's blanket assertion of privilege. The Court instead ruled that, unless the witness was a member of the GK control group or had entered into an attorney client relationship with GK's Lawyers, GK had to provide contact information and could not prevent ex-parte interviews.

Upon receiving the Court's Order, GK's Lawyers then made the strategic decision to represent not just GK (the chapter), but also to sign up dozens of individual former officers and members of the GK as clients. Perhaps GK's Lawyers wanted to ensure that all members of GK "ran with the herd" in defense of the GK. This action blocked Plaintiff from access to the individual witnesses, but it created the present ethical conflicts.

At the time GK's Lawyers agreed to represent these individuals, GK had taken the position that, before the Hewlett attack, GK had no knowledge that the rapist, Relopez, was a dangerous predator of women. However, the "knew nothing" defense has unraveled in the early stages of discovery. Multiple witnesses have testified that at least 8 months before Relopez' assault on

Hewlett, certain GK officers knew of credible allegations that Relopez had raped, sexually abused and harassed several women and that sexual abuse of women by other GK members had also occurred. Moreover, according to sworn deposition testimony, at least 7 months before Hewlett was raped, GK convened a meeting to discuss what actions to take in response to the above, and the members of GK were divided on the issue. However, GK ultimately decided to take no meaningful action to curb these abuses, punish Relopez or other perpetrators, or change the practices of the fraternity. Moreover, Relopez' criminal acts continued during 2015, yet individuals within GK failed to report them to authorities, and even covered some up.

If all defendants were fully indemnified for civil liability, perhaps a plausible argument could be made that these conflicts could be fully disclosed and knowingly waived. However, these conflicts are too pervasive and too fundamental the representation to be ethically handled through waiver. GK's Lawyers know the insurer has sent a "no coverage, no indemnity" letter to GK which clearly states that the insurers will not pay any judgement taken against them based on policy exclusions. The lack of any coverage exacerbates the ethical problems, because if the GK's "knew nothing" defense is not successful, the individuals will be exposed to a potentially ruinous judgement if they "run with the herd." Put another way, some members of GK are going to be better off testifying that they disagreed with the GK's decisions and conceding (in the face of strong evidence) that GK did have knowledge in order to distance themselves from GK's decisions. And, in fact, there is evidence that GK members were divided on what course of action to take.

In November, 2017, GK's Lawyers finally disclosed the existence of the "no coverage" letter to Plaintiff's counsel. Upon receiving the "no coverage" letter and evaluating the depositions, Plaintiff raised the conflicts issues and notified Defendants that individual members

of the chapter would likely need to be sued.  Plaintiff has now brought claims in State Court against many GK officers and members she believes committed negligent acts.

One reason a conflict arises is that some of GK's members represented by GK's Lawyers clearly had more prior knowledge and are more culpable than others.  Each individual represented by GK needs to determine, with the help of counsel untainted by conflicting duties to other clients, what is the best course of action for them.  They need to determine whether it is in their best interest to seek early resolution and cooperate with Plaintiff or defend the case through trial.  No single law firm can provide this counsel.  The individuals cannot evaluate these decisions with counsel without first revealing the facts of their participation, conversations, and actions with counsel.  However, GK's Lawyers cannot ethically obtain this confidential information with some clients and conceal what they learn from other clients.

For example, if one individual now discloses information to GK's Lawyers that could be harmful to the defense of other defendants or GK as part of a settlement or otherwise, how could GK's Lawyers ethically hold such conversations in confidence from other clients they represent?  GK's Lawyers have duties to each client, but how could GK's Lawyers effectively cross examine and impeach their own client?  Moreover, GK may try to distance itself from individuals that did not fully disclose what they learned about Relopez prior to Hewlett's rape.  How can one lawyer represent the Chapter and also maintain in confidence all information and facts disclosed to them by individual clients?

To cite another example, Plaintiff has advised each individual that it is open to discussing settlement.  How can one law firm, with duties to both GK and many other individuals, ethically advise one client whether it should seek a settlement and distance itself from GK's position, or

refuse to settle and align themselves with GK's position in trial? Here, GK's Lawyers are "materially limited by the lawyer's responsibilities to another client."

Additionally, another conflict arises because GK's members have claims against Sigma Chi and the Insurer group for their failure to adequately protect them by purchasing appropriate insurance, as explained in Plaintiff's letter dated December 1, 2017. *See* Exhibit B. The individuals require counsel who are able to press claims for insurance coverage or other damages with Sigma Chi and the insurers. However, GK's Lawyers are paid by the insurers and have longstanding relationships which prevent them from pressing these claims.

Finally, GK's Lawyers must also withdraw from representing GK going forward if their firm has obtained confidential information from communications with any of the individuals.

## STATEMENT OF FACTS

1. GK "is an unincorporated association operating in Utah [that] was granted a charter from Sigma Chi Fraternity" that is represented by Saul Ewing Arnstein & Lehr LLP. (Answer of Gamma Kappa to Plaintiff's First Amended Complaint ("Answer") at 4; Dkt. 74.)

2. Victoria has alleged that GK is liable in negligence for, *inter alia*, (a) permitting Relopez to remain in the fraternity and live in the GK Chapter House when he was a known sexual predator and a threat to "repeat offend;" (b) creating an environment in which the likelihood that Victoria could be sexually assaulted at its Chapter House was increased, by permitting GK and its members to disregard rules concerning sexual consent and responsible use of alcohol at GK's Chapter House; (c) once the environment had been created, failing to enact sufficient measures to prevent dangerous and harmful activities at the GK Chapter House; and (d) on the night of the incident, refusing pleas from Victoria's friends that the House Manager allow entry into Relopez'

room so they could protect Victoria from the attack. (*See* First Amended Complaint and Jury Demand at 18–21; Dkt. 57.)[2]

3. On December 1, 2017 Plaintiff informed GK's Lawyer that circumstances would require claims to be filed against individual GK members and notified Defendants of the conflicts resulting from the representation of adverse clients. (*See* Exhibit B.)

4. Defendants requested that the issue be tabled, pending mediation with GK. Mediation occurred on February 20, 2018 but did not result in settlement.

5. On March 1, 2018, Plaintiff filed an action in Utah state court against 24 former officers of GK, all of whom are represented by GK's Lawyers in this case. Whereas this case seeks to hold GK liable, the state court action seeks to hold the individual officers directly liable for their role in contributing to Plaintiff's harms.[3] (*See* State Court Complaint; Exhibit C.)

6. The following facts are examples provided to show that disqualifying conflicts exist. They are not a complete list of such events.

**A.    Mr. Steven Whitten knew of M.K.'s rape in the fall of 2014.**

7. In responding to allegations of the Complaint, GK denied knowledge that Defendant Relopez raped a woman (M.K.) before he raped Plaintiff. (*E.g.* Answer at 7 (responding to Paragraph 52) and at 9 (responding to Paragraph 72); Dkt. 74.)

---

[2] After receiving leave of this Court, Plaintiff filed a Second Amended Complaint. (Dkt. 132.) Because GK has not answered that Complaint, references herein are to the First Amended Complaint and GK's response thereto. Because no allegations against GK were changed in the Second Amended Complaint, Plaintiff does not expect GK's response to be different.

[3] Plaintiff proceeded in State Court against the individual officers after learning that GK's insurance policy may not cover the officers or GK for this liability. The action was filed as a separate State Court lawsuit because, while the statute of limitations has not run on these negligence claims, the Parties in this Action were unable to reach a stipulation to add these claims to this lawsuit.

8. GK also denied having any knowledge that Defendant Relopez had a history of sexually aggressive and inappropriate behavior. (*E.g. id.* at 13 (responding to Paragraph 123).)

9. GK's Lawyers represent Mr. Steven Whitten, a former member and officer of GK. (*See* Aug. 16, 2017 Letter from Mr. Eveland at 1; Exhibit D.)

10. During the fall of 2014, Mr. Whitten assisted another GK officer "with some of the risk management" duties. (Relopez Depo at 111:14–23; Exhibit E.)

11. After Relopez had raped M.K., and during the fall of 2014, Mr. Whitten went to M.K.'s apartment to talk to M.K. about what Relopez had done. (M.K. Depo at 31:16–25; Exhibit F.)

12. M.K. was told that Mr. Whitten was a risk manager for GK. (*Id.*)

13. M.K. testified during her deposition that she told Mr. Whitten the following: "I was raped by Jason Relopez." (*Id.* at 35:3–14.)

**B.    Mr. Knowlton's knowledge that Victoria was in Relopez' room on the night of the rape.**

14. In responding to allegations of the Complaint, GK denied knowledge that Connor Knowlton, a member of GK who was serving as the House Manager, was told by a friend of Plaintiff that Plaintiff was in Relopez' room on the night of the rape. (*E.g.* Answer at 12–13 (responding to Paragraphs 119–121); Dkt. 74.)

15. GK also denied that Mr. Knowlton refused to open Relopez' room, as requested by Victoria's friend. (*Id.*)

16. GK's Lawyers represent Mr. Knowlton, a former member and officer of GK. (Gamma Kappa's Second Supplemental Rule 26(a)(1) Disclosures at 6; Exhibit G.)

17. On the night Victoria was raped by Relopez, a friend of Victoria (Ms. Stromberg), started banging on the door to Relopez' room after she realized Victoria was in the room at it was locked. (Stromberg Depo at 28:22–29:7; Exhibit H.)

18. Ms. Stromberg's friend told her that Mr. Knowlton was the house manager at that time. (*Id.* at 29:11–13.)

19. Ms. Stromberg's friend got Mr. Knowlton and brought him to Ms. Stromberg. *Id.* at 29:12–17.)

20. Ms. Stromberg told Mr. Knowlton that she needed him to open Relopez' door because she needed to get Victoria out of Relopez' room. (*Id.* at 29:17–22.)

21. Mr. Knowlton told Ms. Stromberg he would not open the door because of a fraternity policy. (*Id.* at 29:22–24.)

22. The House Manager and other members of the fraternity have access codes to room door locks, to allow entry into the room if there is a situation requiring such entry. (Relopez Depo at 162:7–13 and 165:2–18; Exhibit E.)

**C. Mr. Weyand knew that Relopez had been barred from Kappa Delta sorority events due to allegations of physical and emotional abuse of women.**

23. In responding to allegations of the Complaint, GK denied knowledge that Defendant Relopez was barred from attending events at the Kappa Delta sorority due to complaints of Relopez' verbal, emotional, and physical abuse of Kappa Delta women (Answer at 9 (responding to Paragraph 73); Dkt. 74)

24. GK's Lawyers represent Mr. Harrison Weyand, a former member and officer of GK. (*See* Sigma Chi Corporation's August 17, 2017, Supplemental Disclosure at 7; Exhibit I.)

25. In early November, 2014, a sorority at USU (Kappa Delta) sent a letter to Relopez letting him know he was not allowed to attend any future Kappa Delta events or functions because of his abuse of women. (Relopez Depo at 98:16–99:10; Exhibit E.)

26. Relopez testified that after receiving the letter, he showed it to Mr. Weyand and possibly other fraternity brothers. (*Id.* at 229:19–21 and 230:6–24.)

27. While showing Mr. Weyand the letter, Relopez told Mr. Weyand "I can't go to any events" at Kappa Delta. (*Id.* at 230:25–231:5.)

**D. Mr. Renner and Mr. Fairbanks' (and other GK members') knowledge of Relopez' inappropriate behavior.**

28. GK's Lawyers represent Mr. Kyle Renner, a former member and officer of GK. (Gamma Kappa's Second Supplemental Rule 26(a)(1) Disclosures at 8; Exhibit G.)

29. GK's Lawyers represent Mr. Paden Fairbanks, a former member and officer of GK. (*Id.* at 5.)

30. GK's Lawyers represent other officers who were members of the Judicial Counsel that was supposed to hear conduct violation matters.

31. In about November, 2014, Mr. Kyle Renner made a motion at a fraternity meeting to have Relopez removed from his position as Risk Manager of GK and consider other consequences. (Relopez Depo. at 106:21–107:1; Exhibit E.)

32. The motion arose after an event involving Relopez and a date of his at the GK Formal weekend in Jackson Wyoming. Relopez, who was the elected Risk Manager for GK, spent the weekend "really, really intoxicated the whole time." (*Id.* at 102:7–16.) Then, during the Formal, his date was served extreme amounts of alcohol and then, while incapable of consenting

due to impairment, she was observed having sex with other members of GK in a series of public areas of a hotel. This was reported to GK by several people outside the fraternity.

33. During the Fraternity meeting that resulted, Relopez was asked to step out of the meeting while his conduct was discussed and a vote was taken. (*Id.* at 105:23–106:13.)

34. After the meeting, Relopez spoke with Mr. Paden Fairbanks, who was the acting president of GK. (*Id.* at 107:24–108:4.)

35. Mr. Fairbanks told Relopez that the vote was really close about whether to remove him, but that they were not going to forcibly remove him or sanction him. (*Id.* at 108:5–20.)

36. Thereafter, despite GK's officers' knowledge that Relopez was involved in at least three more violent incidents in the first half of 2015, Relopez was permitted to remain a GK and live at the GK house without restrictions.

## ARGUMENT

### I. A CONFLICT EXISTS UNDER RULE 1.7 BETWEEN GK'S LAWYERS AND OFFICERS THAT GK'S LAWYERS REPRESENT IN THIS MATTER.

Attorneys practicing before this Court are governed by, and must comply with, the Utah Rules of Professional conduct "as interpreted by this court." DUCivR 83-1.1(g). Under Rule 1.7 of the Utah Rules of Professional, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Utah R. Prof. Cond. 1.7(a) (emphasis added). A concurrent conflict exists if either "[t]he representation of one client will be directly adverse to another client" or if "[t]here is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." *Id.*

In certain situations, clients can give consent, but only if the lawyer can still "provide competent and diligent representation to each affected client," if the representation does not

involve assertions by one client against another in the same matter, and the consent is fully informed and "confirmed in writing." Utah R. Prof. Cond. 1.7(b). However, concurrent conflicts are "nonconsentable," or nonwaivable, "if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation." *See* Utah R. Prof. Cond. 1.7 comments 14 and 15. Concurrent conflicts are also "nonconsentable" "when the clients are aligned directly against each other in the same litigation." Utah R. Prof. Cond. 1.7 comment 14 and 17.

Here, GK's Lawyers are representing individuals whose positions and testimony are adverse or potentially adverse. To cite one of many examples, GK is denying knowledge of Relopez' rape of M.K. before Relopez raped Victoria. However, M.K. testified under oath that she told Mr. Whitten that Relopez had raped her, and that Mr. Whitten was there on behalf of the GK board as part of risk management. This is particularly damaging because it confirms that GK knew that Relopez had raped someone about eight months before he raped Victoria, and yet allowed him to remain a resident of GK's Chapter House (and also failed to have proper procedures in place to allow for access to private rooms, especially Relopez', when there were complaints brought to their attention). It seems unlikely that Mr. Whitten will deny reporting this to GK, but either way, his testimony will be adverse to GK. If Mr. Whitten reported what he had been told to GK, his testimony is adverse to any other officer that denies knowledge of this rape.

Further, Relopez' sworn testimony strongly suggests that many of the other members of GK (many of whom are represented by GK's Lawyers) knew enough of Relopez' inappropriate behavior that they convened a meeting to consider having him removed from office and punished. Those that wanted to see meaningful sanctions and took steps towards that end will have different

testimony and different exposure to personal liability than those that did not. Indeed, those State Court defendants may wish to settle and testify truthfully about their concerns.

Because individual chapter officers have been sued directly, they may be individually liable for their actions. An officer or agent of an organization who commits a tort is individually liable for negligence. *E.g. Armed Forces Ins. Exch. V. Harrison*, 70 P.3d 35, 41 (Utah 2003) (explaining while an "officer or director of a corporation is not personally liable for torts of the corporation or of its other officers and agents merely by virtue of holding corporate office," they can "incur personal liability by participating in the wrongful activity.") [4] The organization is only liable if the action is authorized or within the course and scope of the agent's authority. *E.g. Zions First Nat. Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988) (explaining entities are liable for the actions of its agents that are, inter alia, expressly authorized or that are "incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent.") Under these circumstances, when GK as an organization denies any knowledge of Relopez' prior crimes and says it acted appropriately, how can GK's Lawyers give unfiltered advice to all of the individuals?

Plaintiff does not believe these conflicts are waivable for several reasons. As explained in Mr. Wahlquist's declaration, it is hard to envision that a reasonable person, once fully informed of all the conflicts and their ramifications, would consent to joint representation in this situation. Joint representation of clients means that statements by one client are not protected from disclosure to another client. Many of GK's Lawyers' clients may want to disclose things they knew and/or

---

[4] For example, officers that decided to allow Relopez to remain in GK and live in the chapter house with knowledge of Relopez' prior actions are susceptible to personal liability for their actions.

observed that were adverse to GK's position, but being properly informed, may not feel they can. In addition, many of the GK's Lawyers' clients' positions are going to be (or should be) directly adverse as certain officers who may have truly lacked individual knowledge seek to avoid liability by testifying truthfully about what they reported to others, or what positions they expressed when GK's members were considering whether punishments and changes in policy should occur. And, given the complexity of up to 24 sets of fingers being pointed in different directions with different pieces of adverse testimony, it is hard to understand how GK's Lawyers can reasonably conclude that they will be able to provide competent and diligent representation to all of the individuals GK's Lawyers represent.

## II.  DISQUALIFICATION IS REQUIRED TO AVOID EVEN MORE SERIOUS ETHICAL PROBLEMS AS THIS CASE PROCEEDS.

In determining whether to disqualify counsel, this Court carefully considers "(1) the egregiousness of the violation, (2) the presence or absence of prejudice to the other side, (3) whether and to what extent there has been a diminution of effectiveness of counsel, (4) hardship to the other side, and (5) the stage of trial proceedings." *Flying J Inc. v. TA Operating Corp.*, 2008 WL 648545, at *6 (D. Utah Mar. 10, 2008) (Exhibit J).  Each factor will be discussed below.

### A.  GK's Lawyers have demonstrated disregard for Rule 1.7.

As explained above, GK's Lawyers represent individuals with conflicting testimony and those individuals will likely need to consider whether they are better off supporting the position of GK and certain individuals or instead seeking to distance themselves from those entities.  The differences are significant enough that they are likely the difference between whether or not GK itself and some of the individual officers will be found liable.  Since GK's insurer has advised the individuals that there is no indemnity to cover any judgement entered against the individuals, the

decision to "remain with the herd" could result in a ruinous judgement being taken against them. These individuals need representation from lawyers without conflicting duties to the chapter and others. Additionally, some of the individuals have probably already given information to GK's Lawyers that may be in conflict with GK and could harm them or certain other defendants GK's Lawyers represent. For this reason, the lawyers are not only conflicted from the individual representations, they must be disqualified from representing GK. Otherwise, this confidential information cannot be ethically kept confidential by GK's Lawyers.

As an example of how representing associations such as GK and individual officers creates a multitude of concurrent conflicts, consider *Gilbert v. Utah State Bar*, 379 P.3d 1247 (Utah 2016). There, a nonprofit foundation ("Foundation") operated through various chapters ("Chapters"), which Chapters each had board members. Some, but not all, of the board members became unhappy with the functioning of the Foundation and broke off and formed a new nonprofit organization with essentially the same goals ("Association"). The discord and separation created two lawsuits between the Foundation, the Chapters, the Association, and some board members. During the course of the disputes, an attorney ("Gilbert") represented the Chapters, the Association, and various board members individually ("Individual Defendants"). *Id.* at 1251–52. Gilbert's actions resulted in disbarment,[5] Gilbert appealed, and the Utah Supreme Court affirmed. The court found no error in the district court's conclusion "that Gilbert simultaneously represented the Individual Defendants, the Chapters, and the Association 'when a concurrent conflict of interest existed between some of the parties' interests'", thereby precluding Attorney "to consult

---

[5] Gilbert's actions included accepting money he knew or should have known he could not accept due a court order and then refusing to return the money, defying another court order.

with or advise the *other* board members of the Chapters to take actions that could be contrary to" the Individual Defendants. *Id.* at 1255 (emphasis added).

### B. There is prejudice to GK, GK officers, and Plaintiff.

Assuming GK's Lawyers have spoken with their clients and conducted interviews, they undoubtedly have collected information and testimony from their clients that is adverse to others they represent. Taking advantage of a relationship involving a concurrent conflict of interest to learn of adverse information creates sufficient prejudice in favor of disqualification. *Brigham Young Univ. v. Pfizer, Inc.*, 2010 WL 11414472 at *9–10 (D. Utah Aug. 24, 2010) (Exhibit K).

### C. GK's Lawyers' effectiveness has been diminished by the numerous conflicts.

The concurrent conflicts existing in GK's Lawyers' representation of GK's officers as undoubtedly will diminish GK's Lawyers' effectiveness. Due to the conflicts explained above, GK's Lawyers will not be able to put forward all the arguments in favor of each client. Having conflicts that prevent or diminish an attorney's ability to vigorously defend its clients' merits disqualification. *U.S. v. Emigration Improvement Dist.*, 2016 WL 4148251 at *5 (J. Parrish, D. Utah Aug. 4, 2016) (finding attorneys' effectiveness had been diminished and favored dismissal where attorneys did not put forth arguments in favor of their client in opposition to an order holding them jointly liable for wrongful lien) (Exhibit L). The conflicts similarly will make it impossible for GK Lawyers to give uncolored, unconflicted advise to each individual they represent about settlement options or litigation strategy.

### D. Hardship to GK's Officers favors disqualification.

Although requiring GK's Officers to obtain independent counsel may work some hardship on them, the difficulty of obtaining independent counsel now, before depositions of GK officers

and members have begun, is significantly lower than the hardship each officer will face if they are found liable for the harms Plaintiff has suffered. In any event, it is hard to see how the Court can have confidence that the current representation will truly allow each client to have confidence that the positions taken, including whether to settle, are truly tailored only to serve their best interests.

### E. The stage of trial proceedings favors disqualification.

Here, trial is still a long way off. While some discovery has been done, the majority of fact depositions, including depositions of the individual GK officers that GK's Lawyers represent have been stayed in order to resolve this issue. This earlier stage of litigation proceedings favors dismissal. *Emigration Improvement Dist.*, 2016 WL 4148251 at *10.

### CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests this Court disqualify GK's Lawyers from representing GK and its officers in this case.[6]

DATED this 2nd day of April, 2018.

**EISENBERG GILCHRIST & CUTT**

 /s/ Jeffrey D. Eisenberg
Jeffrey D. Eisenberg
Jordan P. Kendall
Christopher P. Higley

**SCALLEY READING BATES HANSEN & RASMUSSEN**
John E. Hansen

**Public Justice, P.C.**
Adele P. Kimmel
*Attorneys for Plaintiff*

---

[6] In our Motion for Leave to Submit Overlength Motion, we stated this motion was to be 17 pages. Adding the table of contents as per DUCivR 7-1(e), pushed the brief onto the 18th page.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of April, 2018, a true and correct copy of the foregoing **MOTION TO DISQUALIFY COUNSEL FOR GAMMA KAPPA** was served via email and US Mail to the following:

Meb W. Anderson
Rachel G. Terry
Utah Attorney General's Office
mebanderson@utah.gov
rterry@utah.gov
*Counsel for USU*

Shawn McGarry
Chelsey Phippen
KIPP & CHRISTIAN
10 Exchange Place, 4th Floor
Salt Lake City, UT 84111
smcgarry@kippandchristian.com
cphippen@kippandchristian.com

Andrew M. Morse
Jordan M. Call
Robert T. Denny
Snow Christensen & Martineau
amm@scmlaw.com
jmc@scmlaw.com
rtd@scmlaw.com
*Attorneys for Sigma Chi Corporation and Gamma Kappa Alumni Foundation, Gamma Kappa House Corporation*

William Eveland
Christopher Naveja
Michael Jacobson
Saul Ewing Arnstein & Lehr LLP
161 North Clark, Suite 4200
Chicago, IL 60601
Toby.eveland@saul.com
Christopher.naveja@saul.com
Michael.jacobson@saul.com
*Attorneys for Gamma Kappa*

Jason Relopez
Northern Utah Community Correctional Center
2445 South Water Tower Way (1125 West)
Ogden, Utah 84401


                                                               /s/ Brooke Hansen